JUDGE PAULEY

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | CIVIL ACTION NO. |
| Plaintiff, | Complaint for Injunctive and Other Equitable Relief and Civil Monetary Penalties Under the Commodity Exchange Act |
| v. | |
| PARNON ENERGY INC., ARCADIA PETROLEUM LTD, ARCADIA ENERGY (SUISSE) SA, NICHOLAS J. WILDGOOSE and JAMES T. DYER, | 11 CV 3543 (WHP) |
| Defendants. | ECF Case |

RECEIVED MAY 24 2011 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff, U.S. Commodity Futures Trading Commission ("Commission" or "CFTC"), by its attorneys, alleges as follows:

### I.    SUMMARY

1.    Commercial users of crude oil regularly buy and sell physical oil -- including a type of crude oil known as West Texas Intermediate ("WTI") -- for delivery in Cushing, Oklahoma, a major delivery point for crude oil in the United States. Crude oil market participants also sometimes hedge their risk or speculate in crude oil by trading commodity futures, swaps and options tied to the price of WTI ("WTI Derivatives") on various exchanges including the New York Mercantile Exchange ("NYMEX"), a designated contract market.

2.    From in or about late 2007 through April 2008 (the "relevant period"), a common enterprise comprised of crude oil speculators Parnon Energy Inc. ("Parnon"), Arcadia Petroleum Ltd. ("Arcadia Petroleum") and Arcadia Energy (Suisse) SA ("Arcadia Suisse") (collectively "Parnon/Arcadia"), by and through their agents and employees, including but not limited to

1

James T. Dyer ("Dyer") and Nicholas J. Wildgoose ("Wildgoose") unlawfully manipulated and attempted to manipulate the NYMEX WTI financial contract prices.

3.     During the relevant period, the supply of crude oil including WTI at Cushing was relatively low, and WTI prices reflected that tightness.  As alleged more particularly below, beginning in or about late 2007, Dyer and Wildgoose, who directed the WTI physical and Derivatives trading for Parnon/Arcadia, planned to and did take advantage of and exacerbate the tight market, and developed and executed a manipulative strategy designed to affect WTI Derivatives prices by, among other things:

- Amassing a sufficient quantity of physical WTI to be delivered the next month at Cushing to dominate and control WTI supply even though they had no commercial need for crude oil;

- Contemporaneously purchasing a long WTI Derivatives position on the NYMEX and IntercontinentalExchange Inc.'s ICE Futures Europe ("ICE") with the intent to artificially inflate the value of that position by driving WTI prices higher;

- Holding on to their dominant physical WTI position, to give other market participants the impression that the supply would remain tight, and thus to artificially inflate WTI prices as they sold off their long WTI Derivatives position;

- Selling short a second series of WTI Derivatives at artificially high prices;

- Completing the cycle by surprising the market with an unexpected sell-off of their WTI physical position, driving WTI prices back down and increasing the value of their short WTI Derivative position.

4.     The scheme artificially increased the price of crude oil physical, derivatives and other oil products in the United States and elsewhere.  In January and again in March 2008, Dyer and Wildgoose conducted the entire cycle of this manipulative scheme.  In February 2008, credit issues prevented them from completing the cycle.  After taking steps to attempt to manipulate

WTI prices in April 2008, they aborted their scheme upon learning of a CFTC investigation into their unlawful conduct.

5.     By engaging in such conduct, Dyer and Wildgoose violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6(c), 6(d), 13(a)(2). Because Wildgoose, Dyer, and other agents and/or employees of Parnon, Arcadia Petroleum, and/or Arcadia Suisse acting at their direction, violated the Act by engaging in conduct that was within the scope of their agency or employment, Parnon, Arcadia Petroleum, and Arcadia Suisse are vicariously liable for their violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B). Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin such acts and practices, and compel compliance with the Act. In addition, the Commission seeks civil penalties and such other ancillary relief as the Court deems necessary or appropriate under the circumstances, including, but not limited to, disgorgement of unlawful profits, restitution and damages.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), which authorizes the Commission to seek injunctive relief against any person, or, to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder.

7.     Pursuant to F.R.Civ.P. 4(k)(2), this Court has personal jurisdiction over Arcadia Petroleum, Arcadia Suisse and Dyer because they have sufficient minimum contacts with the United States and the assertion of jurisdiction over them is reasonable.

8.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2006), in that Defendants transact business in this District and/or the acts and

practices in violation of the Act have occurred or are occurring within this District.

### III.    THE PARTIES

9.    Plaintiff **U.S. Commodity Futures Trading Commission** is an independent

federal regulatory agency that is charged with the responsibility for administering and enforcing

the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17

C.F.R. §§ 1.1 *et seq.* One of its core responsibilities is to protect the public interest by deterring

and preventing price manipulations of the commodity markets and futures markets, and other

disruptions to market integrity. 7 U.S.C. § 3 (2006).

10.    Defendant **Parnon Energy Inc.** is a corporation organized and existing under the

laws of Texas with its principal place of business in Rancho Santa Fe, California. Parnon is a

subsidiary of Parnon Holdings Inc., which is a wholly owned subsidiary of Farahead Holdings

Ltd., and is an affiliate of Arcadia Petroleum Ltd. and Arcadia Energy (Suisse) SA. Parnon

operates as a common enterprise with Arcadia Petroleum, Ltd. and Arcadia Energy (Suisse) SA.

WTI physical and WTI Derivatives trades conducted by Parnon, Arcadia Petroleum, and Arcadia

Suisse comprised their collective "WTI Book." During the relevant period, trades in the WTI

Book were executed by one derivatives trader employed by Arcadia Petroleum, two derivatives

traders employed by Arcadia Suisse, and one physical crude trader at Parnon (collectively with

Dyer and Wildgoose, the "WTI Group"). Parnon's agents and employees buy and sell WTI

physical and WTI Derivatives for profit, speculating on WTI price movements. Parnon has

never owned or operated an oil refinery and is not an end user of crude oil.

4

11.    Defendant **Arcadia Petroleum Ltd.** is a corporation organized and existing under the laws of the United Kingdom with its office and principal place of business in London, England. Arcadia Petroleum is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Petroleum is engaged in the business of trading crude oil, crude oil products and oil derivatives for profit in various physical and financial markets throughout the world. During the relevant period Arcadia Petroleum officers in London supervised the WTI Group's trading and the financing of its trades, and its officers and employees handled the risk management, compliance, credit, financing, mid-office and back-office functions for Parnon and Arcadia Suisse, which did not have such personnel. One single individual was the CEO and Head Trader of Arcadia Petroleum, and performed the functions of CEO for Parnon and Arcadia Suisse. Wildgoose, Dyer, and the other WTI Group traders reported to this individual.

12.    Defendant **Arcadia Energy (Suisse) SA** is a corporation organized and existing under the laws of Switzerland with its office and principal place of business located in Morges, Switzerland. Arcadia Suisse is a wholly owned subsidiary of Farahead Holdings Ltd. Arcadia Suisse is engaged in the business of trading crude oil derivatives for profit on various exchanges including NYMEX and ICE. During the relevant period an open, two-way communication line was maintained between the Parnon office in California and the Arcadia Suisse office in Switzerland, so that traders in one office could hear and participate in conversations among the traders at the other office. Parnon's WTI physical position and Arcadia Suisse's WTI Derivatives position were described in daily position reports, which were transmitted via email to and reviewed by Dyer, Wildgoose and the CEO of Arcadia Petroleum.

13.    Defendant **James T. Dyer** is an individual residing in Brisbane, Australia. During the relevant period Dyer was an experienced crude oil trader. From approximately 2005

5

through at least 2008, Dyer was responsible for the strategy and trading in the WTI Book. In 2007, in the process of setting up a U.S. trading arm for Arcadia Petroleum, Dyer traveled to the U.S. to meet with and recruit Wildgoose and to negotiate with TEPPCO Partners Inc. on behalf of Arcadia Petroleum for the building of storage tanks that would demonstrate to the market Arcadia Petroleum's ability to store large quantities of physical oil. Dyer acted on behalf of and as agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. In 2008, Dyer earned a base salary and was eligible for and received a bonus based upon the profitability of the WTI Book.

14.     Defendant **Nicholas J. Wildgoose** is an individual residing in Rancho Santa Fe, California. During the relevant period Wildgoose, a crude oil trader, was jointly responsible with Dyer for the strategy and trading in the WTI Book. Wildgoose acted on behalf of and as an agent for Parnon/Arcadia and was authorized to direct the trading of WTI physical and WTI Derivatives on behalf of Parnon/Arcadia. Wildgoose received a base salary and was eligible for and received bonuses based upon the profitability of the WTI Book.

### IV.     FACTS

**WTI Derivatives Trading**

15.     During the relevant period Defendants traded WTI Derivatives, *i.e.,* WTI futures, swaps and options, on NYMEX and ICE. A commodity futures contract is an agreement for the purchase and sale of a particular commodity for delivery on a fixed date in a future month. NYMEX WTI futures contracts call for delivery of WTI at Cushing, Oklahoma. WTI swap and option contracts also come due on a fixed "delivery" date in a future month but are always settled financially.

6

16.    The nearest delivery month for a futures, swap and option contract is known as the "near" or "prompt" month. Trading of a near month WTI Derivative contract is available until a fixed expiry date, after which that month's contract is no longer available to trade, and the subsequent month becomes the new near month for trading purposes. For example, in January 2008, trading of the NYMEX WTI February 2008 futures contract ended with the close of trading on the expiry date, January 22, after which March 2008 became the new near month. NYMEX WTI swaps and options contracts expire one business day before WTI futures contracts expire.

17.    ICE operates a London-based exchange for the trading of futures and other derivatives, which according to ICE "hosts trading in half of the world's crude and refined oil futures contracts traded each day." ICE offers the same WTI Derivative contracts that NYMEX offers. ICE near month WTI Derivatives contracts expire one day prior to the expiry of the NYMEX near month WTI futures contracts. The ICE WTI Derivatives prices are financially settled to the price of the corresponding NYMEX WTI futures contract.

**Trading in Physical WTI Crude Oil**

18.    Physical WTI for delivery at Cushing, Oklahoma in the near month is traded until the end of the third business day following the expiration of the NYMEX WTI near month futures contract. The three-day period after the near month futures contract expiry is known as the "cash window." By the time the cash window opens, commercial users of crude oil generally will have completed all or most of their purchases of physical oil needed for the following month. The cash window gives market participants the opportunity to balance their positions, offset short and long positions, and handle logistical considerations for delivery of crude oil the following month. Trading activity during the cash window is an indicator to the

market of the next month end-of-month balances of Cushing oil stocks, which in turn impacts WTI Derivatives prices.

19. Trades in physical crude oil priced at a Calendar Merc Average ("CMA") are standard in the market. Physical oil priced at CMA is priced ratably at the average of each day's near month settlement price during the month of delivery. Prior to engaging in CMA transactions, physical market participants qualify for such transactions by meeting certain credit-related requirements. Parties to a CMA transaction agree on a price, either at CMA or CMA plus or minus an agreed upon sum. Aside from price and quantity, the other material terms of a CMA transaction are not subject to individual negotiation. After parties consummate a CMA transaction they post a standardized stand-by letter of credit from a third-party bank for 105% of the contract's current notional value. The amount and timing of the letter of credit are not subject to individual negotiation. CMA contracts are fungible between and among qualified parties. CMA contracts are traded: (1) on the "HoustonStreet" electronic trading facility, which is an exempt commercial market under the Act; (2) through brokers; and (3) directly between counterparties. The Defendants' purchases and sales of WTI physical oil alleged herein were conducted in CMA transactions through all three methods.

**Calendar Spreads**

20. The price differential, or "spread," between WTI for delivery in the near month and WTI for delivery in the following month is generally understood to be the best representation of WTI physical supply and demand because that spread reflects near-term demand relative to near-term supply. Market participants can trade this differential via a "calendar spread," which is a pair of contracts, one for the purchase of oil deliverable in one month and one for the sale of the same quantity of oil deliverable in a subsequent month, such as

the February/March 2008 spread. Market participants can trade calendar spreads in WTI physical and WTI Derivatives. When a person acquires a "long" calendar spread, he purchases the near month and sells the following month. When one sells "short" a calendar spread, he sells the near month and purchases the following month.

21.     Near-term supply is generally viewed as being relatively inelastic (*i.e.* more supply can't easily be brought into the market in response to price changes) compared to long-term supply. Therefore, a near month price that is higher than the subsequent month price reflects that market participants are willing to pay a premium for immediate supply. This pricing relationship is commonly referred to as "backwardation" and demonstrates supply tightness, or a shortage in immediate supply relative to demand. When the opposite is true, and the near month price is lower than the next month price, the market is said to be in "contango." This pricing relationship indicates that the market is well supplied relative to demand, such that the higher later month price compensates market participants for storing crude oil to sell later.

22.     WTI calendar spread prices are sensitive to the end-of-month balances of crude oil stocks at Cushing. A market perception that the WTI supply at Cushing is tight will tend to drive near month prices higher relative to the following month; and a market perception of a WTI surplus at Cushing will tend to drive near month prices relatively lower.

**The Manipulative Scheme**

23.     During the relevant period, Dyer and Wildgoose expected that their physical WTI trading would affect the calendar spread prices of WTI Derivatives traded on exchanges. They also understood that during this period the market was in backwardation and the physical supply of crude oil at Cushing was relatively tight, or as Wildgoose remarked at the time, the supply was "close to vapours."

9

24.     In September 2007, Dyer indicated to other Parnon/Arcadia traders in an email that there is a "shitload of money to be made shorting" NYMEX WTI calendar spreads *if* the rest of the market *believes* supplies at Cushing are tight, but someone unexpectedly turns the end-of-month balance into a "surplus."

25.     Thereafter, as alleged more particularly below, the Defendants' manipulative scheme comprised taking the following steps:

> *First*, amassing a large physical WTI position, to be delivered the next month at Cushing, to dominate and control WTI supply even though they had no commercial need for crude oil;

> *Second*, contemporaneously establishing a long near month/next month WTI Derivatives calendar spread position on the NYMEX and ICE with the intent to artificially inflate the value of that position by driving WTI prices higher;

> *Third*, refraining from selling their physical WTI before the cash window opened, to lull the market into believing that they had committed their oil to storage or commercial use, and thus cause or contribute to causing the near month calendar spread to rise to an artificial level, to maximize the value of the their long WTI Derivatives position;

> *Fourth,* establishing a substantial short position in the subsequent series of WTI Derivatives calendar spreads at artificially high prices, knowing they were about to surprise the market with a surplus of physical WTI;

> *Finally,* suddenly selling/dumping their physical position during the cash window, thus creating the surprise surplus they had planned all along, to drive prices back down and maximize the value of their short WTI Derivatives calendar spread position.

26.     In January and March 2008, by successfully executing this scheme, Defendants generated unlawful profits on the long WTI Derivatives position they acquired before driving prices up, and from the short WTI Derivatives position they established before driving prices back down. In particular, Dyer and Wildgoose caused, or contributed to causing, the following NYMEX WTI calendar spread prices to be artificial on the specified dates:

10

- The February/March 2008 spread on January 16, 17, 18 and 22, 2008;

- The March/April 2008 spread on January 23 and 24, 2008;

- The April/May 2008 spread on March 14, 17, 18 and 19, 2008; and

- The May/June 2008 spread on March 20 and 24, 2008.

## Defendants Executed the Scheme in January 2008

### *The Accumulation of the Physical Position*

27.     On or about January 3, 2008, Dyer predicted that the February end-of-month Cushing balance would be approximately 7 million barrels of physical WTI to be delivered in February. Thereafter, knowing that the market was already tight, Dyer and Wildgoose intended to and did acquire a dominant portion of that predicted balance. On January 7, 2008, Wildgoose implored Arcadia Petroleum's Chief Operating Officer to complete standard credit arrangements with potential counterparties so that they could commence trading physical ("cash") WTI: "Can we get this issue resolved pls. time is of the essence here, we need to trade cash with 3rd parties tomorrow as part of the feb/mar wti strategy."

28.     From January 8 through January 16, 2008, Defendants acquired approximately 4.1 million barrels of physical February 2008 WTI. By January 18, the last day of trading of the ICE February 2008 WTI futures contract (the near month), Defendants had increased their long physical position to approximately 4.6 million barrels, or 66% of their predicted 7 million-barrel end-of-month balance. On or about January 27, 2008, Wildgoose estimated that there would be 5 million barrels of physical February 2008 WTI available at Cushing for February delivery, down from his prior estimate of 7 million barrels. They held a dominant position.

29.     Defendants refrained from selling their dominant position through January 22, the final day of trading for the NYMEX February 2008 WTI futures contract. Absent the

manipulative scheme, holding on to a large physical position beyond the expiry of the near

month futures contract is economically irrational for an enterprise like Defendants', which has no

commercial need for crude oil and plans to sell the position by the end of the current month.

Such an enterprise should expect to incur substantial losses from selling off a large physical

position during the cash window.

30.    But Defendants had no commercial purpose for the oil; rather Dyer and

Wildgoose were operating a manipulative scheme. They wanted to lull market participants into

*believing* that supply would remain tight; that they would not be selling their physical position.

Knowing that the market did not expect them to engage in an uneconomic fire sale, Dyer and

Wildgoose accumulated a long physical position with the secret intent to surprise the market later

by selling in the cash window. They knew that as long as the market believed that supply was

tight and getting even tighter, there would be upward pressure on the prices of WTI for February

delivery relative to March delivery, which was their goal.

### The Purchase of February/March WTI Derivative Calendar Spreads

31.    On or about January 3, 2008, while planning to accumulate the physical position,

Dyer and Wildgoose also planned to establish a long position in the February/March WTI

Derivative calendar spread, to profit from the intended artificial prices. As Dyer stated: "our

plan, as outlined y[ester]day is to get to around 15k long the WTI February contract by the start

of the rolls [*i.e.,* January 8 through 14, 2008] assuming prices remain at these kind of numbers."

32.    By January 10, Defendants had established a long February/March 2008 WTI

Derivative calendar spread position of approximately 13,600 contracts, equivalent to

approximately 13.6 million barrels, on NYMEX and ICE. Over the same period, Defendants'

accumulation and holding of physical WTI caused or contributed to causing the February WTI

Derivatives prices to be artificially high as compared to the March WTI Derivatives prices, and thus unlawfully increased the value of their long February calendar spread position. For example, on January 3, 2008, when the Defendants began accumulating a long February/March 2008 WTI Derivative calendar spread position, the NYMEX February/March WTI futures price differential closed at $0.24 (*i.e.,* the February price was $0.24 more than March). By January 16, when prices were artificial, the spread was $0.48. On January 17, the spread was at an artificial level of $0.56. By January 18, the spread was at an artificial level of $0.65, a nearly four-fold increase from January 15. On January 22 (after the three-day weekend of January 19-21 when the NYMEX was closed), that differential was still at an artificially high level of $0.64.

33.     Between January 16 and 18, 2008, Defendants sold the equivalent of approximately 10.7 million barrels of their long February/March WTI Derivative calendar spread position. On January 22, 2008, the last trading day of the NYMEX February WTI futures contract, Dyer and Wildgoose sold the remaining 2,241,000 barrels of their long February WTI Derivative calendar spread position at a month-high price.

### The Shorting of the March/April WTI Derivative Calendar Spreads

34.     On January 23, 2008, the first day of the January cash window, the February futures contract had expired, and March had become the new near month. Defendants still held nearly all of their 4.6 million-barrel physical WTI position for delivery in February 2008. Dyer and Wildgoose knew that the March/April 2008 calendar spread would and did trade at artificially high prices, which they had caused or contributed to causing by accumulating and holding a dominant physical position. They secretly planned to suddenly sell-off their large physical position in the cash window, which they expected would drive down the price of March WTI Derivatives relative to April. They plotted to take advantage of that intended price drop by

taking a short position in March/April WTI Derivative calendar spreads in advance of the sell-off.

35.     On January 22, 2008, Defendants held a short position equivalent to approximately 5.8 million barrels of the March/April 2008 WTI Derivative calendar spreads. On January 24, they increased this short position to approximately 9.8 million barrels. On January 25, they increased their short position again to approximately 12.2 million barrels, and began to offset that short exposure on the same day after they dumped their long physical February position. Over this period, Defendants' accumulation and holding of physical WTI caused or contributed to causing the March WTI Derivatives prices to be artificially high as compared to the April WTI Derivatives prices. For example, on January 23, the NYMEX March/April 2008 WTI futures calendar spread was artificially high, at $0.37. On January 24, that price differential increased to an artificially high $0.42. The manipulative cycle, at least for January, was nearly complete.

*The Sudden Sell-Off of the Physical Position*

36.     Having lulled the market into believing supply would remain tight, it was time pursuant to the manipulative scheme for the Defendants to catch the market by surprise by dumping the dominant physical position during the cash window, thus turning the tight supply into a surplus. Dyer and Wildgoose knew and intended that once they dumped their February 2008 physical position -- which Wildgoose referred to as the "inevitable puking" of the position -- the market would be surprised and realize there was far more physical WTI available at Cushing than previously was evident. As Wildgoose wrote in a January 24, 2008 email, "this time tomorrow those balances will be much more apparent."

14

37.   Wildgoose was correct: On Friday, January 25th, the final day of the cash window, Defendants dumped approximately 4.6 million barrels of their remaining physical WTI deliverable in February.

38.   As Defendants dumped the physical position on January 25, 2008, the cash/futures market moved from backwardation to contango, as the February cash price -- which had been much higher (approximately 65 cents higher) than the March futures price only the day before -- dropped to $0.32 *below* the March futures price, a $0.97 movement. This phenomenon, flipping from backwardation to contango on the last day of the cash window, happened only twice between January 2006 and January 2011. Those two times were when Dyer and Wildgoose successfully completed their manipulative scheme in January 2008 and then again in March 2008.

39.   On January 25, the March/April 2008 NYMEX futures spread also dropped nearly in half, from $0.42 (on the previous day) to $0.24. As a result of the market being forced into contango, Parnon/Arcadia took a significant loss from simultaneously selling their February 2008 WTI physical position and buying a March 2008 WTI physical position in the cash window. Parnon/Arcadia's losses in the physical position were far exceeded by the profits they gained on the WTI Derivatives positions, as alleged more fully below.

40.   On Monday, January 28, 2008, Wildgoose observed in an email that the dumping had "the desired effect" on their short position in March/April WTI Derivative calendar spreads. The January manipulative cycle was complete.

**February 2008**

41.     Dyer and Wildgoose intended to repeat the manipulative scheme in February

2008. They were prevented from doing so, however, due to credit issues that were not resolved

in time, even though Wildgoose asked that the issues be treated as a "highest priority."

**Defendants Repeated The Scheme in March 2008**

42.     In March 2008, Dyer and Wildgoose repeated the scheme they executed in

January 2008. As in January, Dyer and Wildgoose intended to and did: (i) predict the quantity

necessary and acquire a position in physical WTI to dominate and control the end-of-month

Cushing WTI balance, when they knew that supply was already tight, thereby exacerbating the

supply situation; (ii) establish a large long position in near month WTI Derivatives calendar

spreads; (iii) refrain from selling their WTI physical position until after the near month WTI

Derivatives contracts expired and the cash window opened, to push the near month WTI

Derivatives calendar spread to an artificially higher value and sell their long WTI Derivatives

position at these higher values; (iv) substantially increase their short position in the second WTI

Derivatives spread at artificially high prices; and (v) surprise the market by dumping their

dominant physical position, driving prices back down.

43.     In March 2008, Dyer and Wildgoose predicted that the April end-of-month

Cushing balance would be approximately 7.5 million barrels of physical WTI to be delivered in

April. From March 4 to March 14, Defendants amassed a position of approximately 2.8 million

barrels of physical WTI for delivery in April. From March 17 to 18, Defendants increased that

position to approximately 4.1 million barrels. On March 19, the expiration date for the NYMEX

April WTI futures contract, Defendants increased their physical position to approximately 6.3

16

million barrels, or 84% of the end-of-month balance that they predicted. They held a dominant physical position.

44.     From February 27 to March 4, 2008, Defendants built a long April/May 2008 WTI Derivatives calendar spread position equivalent to approximately 13.3 million barrels. On March 13, they increased it to approximately 14.4 million barrels. From March 14 to 19 (the expiry date of the NYMEX April 2008 futures contract), they sold the entire calendar spread position.

45.     In March, Defendants' accumulation and holding of physical WTI caused or contributed to causing April WTI Derivatives prices to be artificially high as compared to the May WTI Derivatives prices. For example, on March 4, 2008 the price spread for the NYMEX April/May 2008 WTI futures calendar spread contract was $0.55 (April was $0.55 higher than May). On March 14, the spread settled at an artificial level of $1.47. On March 17, the spread settled at an artificial level of $1.45. On March 18, the spread settled on the NYMEX (and expired on ICE) at an artificial value of $0.92. On March 19, the NYMEX April/May 2008 spread expired after soaring to an artificial value of $1.94. Meanwhile, the Defendants built a short exposure in the next WTI Derivatives calendar spreads, *i.e.,* the May/June 2008 calendar spread, as per the manipulative scheme. On March 20, the first day of the cash window but before they dumped their physical position, they increased their short May/June 2008 WTI Derivatives position by about 5.5 million barrels, for a total net short position equivalent to approximately 19 million barrels. On March 24, which was the second day of the cash window (after a 3-day weekend), Defendants again increased their May/June short position, to approximately 21.5 million barrels.

46.     On March 20, 2008, Wildgoose observed that high prices of the calendar spreads were only "temporary." At the time, he knew that the prices were at an artificial high prior to their impending secretly planned dump of their physical position. During the March cash window, Defendants sold their entire 6.3 million-barrel physical April WTI position, most of which was sold on the final cash window day. On the second day of the cash window, Wildgoose observed that their physical sales were driving prices down, and predicted that prices would be "much lower on the final day of cash." Wildgoose said he was planning to "sell hard tomorrow starting first thing." On the final day of the March cash window, Dyer and Wildgoose did "sell hard," selling approximately 4.6 million barrels of their April physical WTI position. As Wildgoose then observed, as a result of their selling activity "spreads came off with may/june but not as much as hoped."

47.     On March 20 and 24, 2008, the May/June 2008 WTI futures calendar spread prices were artificial. On March 20, that spread settled on NYMEX at $0.78. On March 24, that spread settled on NYMEX at $0.62. On March 25, the May/June spread fell to $0.39. As a result of the market moving into contango, Parnon/Arcadia took a significant loss from simultaneously selling their April 2008 WTI physical position and buying a May 2008 WTI physical position in the March cash window. Parnon/Arcadia's losses in the physical position were far exceeded by the profits they gained on the WTI Derivatives positions, as alleged more fully below.

48.     At least in part due to Dyer and Wildgoose dumping their April 2008 WTI physical position, the market flipped from backwardation to contango on March 25, 2008.

**Defendants Attempted the Scheme in April 2008**

49.     During April 2008, Dyer and Wildgoose once again intended to execute the manipulative scheme and attempted to manipulate the prices of WTI Derivatives on NYMEX and ICE.

50.     Once again, in April 2008, Dyer and Wildgoose intended to obtain a dominant and controlling position of physical WTI supply for delivery in May, for the purpose of inflating WTI Derivatives spread prices to artificial levels and in their favor, and took steps in furtherance of that plan. Thus, they acquired a substantial long WTI physical position, nearly 8 million barrels of physical WTI for delivery in May, and established a long May/June WTI Derivative calendar spread position equivalent to nearly 16 million barrels.

51.     On or about April 17, 2008, however, Parnon/Arcadia received the CFTC's request for documents relating to their trading activities, thus learning for the first time that their trading activities were under investigation. Thereafter, rather than liquidate their entire physical position as they had done in January and March 2008, Defendants sold only approximately 2.8 million barrels of their May physical WTI position during the cash window, stored approximately 2.5 million barrels, and sold the remaining balance in the following month, *i.e.*, after the cash window had closed.

**Total Profits of Manipulative Scheme**

52.     Over the period January 2008 through April 2008, Parnon/Arcadia executed the manipulative scheme as described above. This repeated conduct lead to at least a physical WTI trading loss of over $15,000,000. However, the artificial spread prices that were created as a result of Parnon/Arcadia's physical trading created profits of over $50,000,000 in their WTI Derivative positions.

19

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNTS I AND II

## MANIPULATION

53.   Paragraphs 1 through 52 are realleged and incorporated herein by reference.

54.   Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it unlawful for any person to manipulate or attempt to manipulate the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market, such as NYMEX.

55.   On or about the dates set forth below, Wildgoose and Dyer intended to and did affect the price spread of the NYMEX WTI Derivatives specified below.  Accordingly, Wildgoose and Dyer violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2002).

56.   Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation.  Because Wildgoose and Dyer were agents or employees of Parnon, Arcadia Petroleum, and Arcadia Suisse and their actions that violated Sections 6(c), 6(d), and 9(a)(2) of the Act were within the scope of their agency or employment, Parnon, Arcadia Petroleum, and Arcadia Suisse are liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

57.   Each and every day the price spreads of the NYMEX WTI Derivatives specified below were artificial due wholly or in part to Dyer and/or Wildgoose's conduct as alleged herein was a separate and distinct violation of Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

| Count | Date | NYMEX WTI Futures |
|-------|------|-------------------|
| I | January 16, 17, 18 & 22, 2008 | February/March 2008 Calendar Spreads |
| | January 23 & 24, 2008 | March/April 2008 Calendar Spreads |
| II | March 14, 17, 18 & 19, 2008 | April/May 2008 Calendar Spreads |
| | March 20 & 24, 2008 | May/June 2008 Calendar Spreads |

## COUNTS III, IV AND V

## ATTEMPTED MANIPULATION

58.     Paragraphs 1 through 52 are realleged and incorporated herein by reference.

59.     Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2), make it unlawful for any person to attempt to manipulate the market price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, including any contract market.

60.     On or about the dates set forth below, Wildgoose and Dyer intended to affect the price spreads of the NYMEX WTI Derivatives specified below, and engaged in repeated overt acts in furtherance of that intent. Accordingly, Wildgoose and Dyer violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2002).

61.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1(B), provides that the act, omission or failure of any official, agent, or other person acting for any corporation within the scope of his employment shall be deemed the act of the corporation. Because Wildgoose and Dyer were agents or employees of Parnon, Arcadia Petroleum, and Arcadia Suisse and their actions that violated Sections 6(c), 6(d), and 9(a)(2) of the Act were within the scope of their agency or employment, Parnon, Arcadia Petroleum, and Arcadia Suisse are liable for those violations pursuant to Section 2(a)(1)(B) of the Act.

21

62.     Each and every overt act in furtherance of the intent to affect the NYMEX WTI

Derivative price spreads specified below is alleged herein as a separate and distinct violation of

Sections 6(c) and 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2).

| Count | Date | NYMEX WTI Futures |
|---|---|---|
| III | January 16, 17, 18 & 22, 2008<br><br>January 23 & 24, 2008 | February/March 2008 Calendar Spreads<br><br>March/April 2008 Calendar Spreads |
| IV | March 14, 17, 18 & 19, 2008<br><br>March 20 & 24, 2008 | April/May 2008 Calendar Spreads<br><br>May/June 2008 Calendar Spreads |
| V | April 16, 2008 | May/June 2008 Calendar Spreads |

## VI.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.      Find Defendants liable for violating Sections 6(c) and 6(d) and 9(a)(2) of the Act,

7 U.S.C. §§ 9, 13b, and 13(a)(2);

B.      Enter an order of permanent injunction restraining and enjoining Defendants and

any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in

active concert with them who receive actual notice of such order by personal service or

otherwise, from directly or indirectly violating Sections 6(c), 6(d) and 9(a)(2) of the Act, 7

U.S.C. §§ 9, 13b and 13(a)(2);

C.      Enter an order directing Defendants to pay civil monetary penalties, to be

assessed by the Court, in an amount not to exceed $130,000 for each violation of the Act or

triple the monetary gain to them for each violation of the Act, as described herein;

D.    Enter an order providing for such other and further remedial and ancillary relief, including, but not limited to, restitution, disgorgement and damages to all persons affected by Defendants' actions, registration and trading bans, as this Court may deem necessary and appropriate; and

E.    Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2).

Dated: May 24, 2011

Respectfully Submitted,

Gregory Scopino
GS-6233
ATTORNEY FOR PLAINTIFF
U.S. COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street, N.W.
Washington D.C. 20581
(202) 418-5175 (telephone)
(202) 418-5519 (facsimile)
gscopino@cftc.gov


Joan Manley
Paul Hayeck
Christine Ryall
Jennifer Diamantis
Melanie Devoe
Saadeh Al-Jurf
Division of Enforcement
ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street N.W.
Washington, D.C. 20581
(202) 418-5334 (telephone)
(202) 418-5523 (facsimile)