UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                        :
U.S. COMMODITY FUTURES
TRADING COMMISSION,             :

              Plaintiff,      :     11 Civ. 3543 (WHP)

        -against-        :     MEMORANDUM & ORDER

PARNON ENERGY INC., *et al.*,    :

          Defendants.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          The U. S. Commodity Futures Trading Commission (the "Commission") brings

this action against Parnon Energy Inc. ("Parnon"), Arcadia Petroleum LTD ("Arcadia"), Arcadia

Energy (Suisse) SA ("Arcadia Suisse"), Nicholas J. Wildgoose ("Wildgoose"), and James T.

Dyer ("Dyer," collectively, "Defendants") for manipulation and attempted manipulation of West

Texas Intermediate crude oil ("WTI") prices in 2008.  Defendants move to dismiss the complaint

for lack of standing and failure to state a claim on which relief may be granted.  For the

following reasons, Defendants' motion to dismiss is denied.

BACKGROUND

I.   The Crude Oil Market

          This litigation involves three types of WTI commodity trades: (1) futures

contracts, (2) physical contracts, and (3) calendar spread contracts.  WTI futures contracts are

agreements for the purchase and sale of WTI[1] for delivery on a fixed date in the future, typically

in Cushing, Oklahoma. (Complaint, dated May 24, 2011 ("Compl.") ¶ 15.) Cushing is the major

delivery point for crude oil in the United States. (Compl. ¶ 1.) WTI futures are traded on several

markets, including the New York Mercantile Exchange ("NYMEX") and the European

Intercontinental Exchange ("ICE"). (Compl. ¶ 17.) The earliest delivery month for a futures

contract is the "near" month. (Compl. ¶ 16.) Trading of near month futures contracts is possible

until a fixed date—the expiry date—after which the futures contract is no longer available, and

the subsequent month becomes the new near month. (Compl. ¶ 16.) For example, in January

2008, trading of the NYMEX WTI February 2008 futures expired on January 22, after which

March 2008 became the new near month futures contract. (Compl. ¶ 16.)

Besides futures, commercial users of crude oil also regularly buy "physical"

contracts, under which WTI is delivered the following month in Cushing. (Compl. ¶ 18.)

Physical contracts are traded until the end of the third business day following the expiry date.

(Compl. ¶ 18.) This three-day period following the expiry date is known as the "cash window."

(Compl. ¶ 18.) For example, physical contracts for February 2008 delivery were tradable until

January 25, 2008. And the three day period between January 22 and 25 was the cash window for

the February physical contracts. The cash window gives commercial users the opportunity to

balance their positions and plan for next month's delivery. (Compl. ¶ 18.) The Commission

alleges that trading and balances during this period are strong indicators of the next month's

overall supply. (Compl. ¶ 18.)

---

[1] All crude oil futures contracts trade in thousand-barrel lots. (See Compl. ¶ 32; see also Charles J. Woelfel, Encyclopedia of Banking & Finance 867 (10th Ed. 1995).)

Physical contracts are often priced at the Calendar Month Average ("CMA"). CMA is the average of each day's near month settlement price during the month of delivery. (Compl. ¶ 19.) Prior to engaging in CMA transactions, physical market participants qualify for such transactions by meeting certain credit-related requirements. (Compl. ¶ 19.) Parties to a CMA transaction agree on a price, either at CMA or CMA plus or minus an agreed upon sum. Aside from price and quantity, the parties do not individually negotiate the other material terms of a CMA transaction. (Compl. ¶ 19.) After parties consummate a CMA transaction, they post a standardized stand-by letter of credit from a third-party bank for 105% of the contract's current notional value. Thereafter, the contracts are fungible among qualified parties. (Compl. ¶ 19.) CMA-priced contracts are traded on the "HoustonStreet" electronic trading facility, through brokers, or directly between counterparties. (Compl. ¶ 19.)

Spread contracts represent the price difference between two commodity contracts. (Compl. ¶ 20.) A "calendar spread" is the price differential between the delivery of WTI in the near month and delivery of WTI in the following month. (Compl. ¶ 20.) A "long" calendar spread consists of two futures contracts: (1) the purchase of WTI for delivery in the near month and (2) the sale of the same quantity of oil in the subsequent month. (Compl. ¶ 20.) A "short" calendar spread is the inverse: a sale in the near month and a purchase in the subsequent month. (Compl. ¶ 20.)

For most commodities, the price of a futures contract includes such carrying costs as storage, insurance, financing, and other expenses the producer incurs as the commodity awaits delivery. Thus, typically, the further in the future the delivery date, the greater the purchase price of the futures contract. That relationship is known as "contango." <u>See</u> Virginia B. Morris

-3-

and Kenneth M. Morris, Standard & Poor's Dictionary of Financial Terms 41 (2007); see also

Barbara J. Etzel, Webster's New World Finance and Investment Dictionary 74 (2003)

("contango[:]  A pricing situation in which the prices of futures contracts are higher the further

out the maturities are.  This is the normal pricing pattern because carrying charges such as

storage, interest expense, and insurance have to be paid in order to hold onto a commodity.").

      Near-term supply of crude oil is generally inelastic, meaning, supply in the near

term does not increase even if prices rise significantly.  (Compl. ¶ 21.)  Long-term supply, on the

other hand, can usually increase to meet market prices and is therefore elastic.  (Compl. ¶ 21.)

Thus, if there is a shortage or tightness in immediate supply, traders are willing to pay a high

premium for near-term supply relative to long-term supply.  Such a market condition is the

opposite of contango and is called "backwardation."  See Jerry M. Rosenberg, Dictionary of

Banking and Finance 41 (1982) ("backwardation:  a basic pricing system in commodities futures

trading.  A price structure in which the nearer deliveries of a commodity cost more than contracts

that are due to mature many months in the future.  A backwardation price pattern occurs mainly

because the demand for supplies in the near future is greater than demand for supplies at some

distant time.").

      Calendar spreads are sensitive to end-of-month balances of oil supply.  (Compl. ¶

22.)  In particular, a market perception that the physical supply of crude oil is low will drive near

term prices higher relative to long-term prices, i.e., into a pattern of backwardation.  (Compl. ¶

22.)  Although somewhat counterintuitive, because the price of a long calendar spread is the

difference in the price of the near month and the next month, long calendar spread contract prices

rise as near term prices trend higher relative to the next month price.  When there is a near-term

glut of supply, the price of the near month trends lower relative to the next month price and the long calendar spread contract price declines. (Compl. ¶ 22.)

II. The Parties

The Commission is a federal agency tasked with administering and enforcing the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 1 et seq., and promulgating and enforcing regulations thereunder, 17 C.F.R. §§ 1.1, et seq. (Compl. ¶ 9.)

Parnon is a corporation organized under the laws of Texas, with its principal place of business in Rancho Santa Fe, California. (Compl. ¶ 10.) Arcadia is a corporation organized under the laws of the United Kingdom, with its principal place of business in London, England. (Compl. ¶ 11.) Arcadia Suisse is a corporation organized under the laws of Switzerland, with its principal place of business in Morges, Switzerland. (Compl. ¶ 12.) Parnon, Arcadia, and Arcadia Suisse are wholly owned subsidiaries of Farahead Holdings Ltd., and operate as a single enterprise to trade in physical and futures contracts for crude oil, including WTI. (Compl. ¶¶ 10, 11, 12.) Dyer resides in Brisbane, Australia, and was responsible for Defendants' trading strategy in WTI between 2005 and 2008. (Compl. ¶ 13.) Wildgoose resides in Rancho Santa Fe, California, and was also responsible for trading WTI for Defendants. (Compl. ¶ 14.)

III. The Alleged Manipulation

The following facts are gleaned from the Complaint and are accepted as true on this motion. In late 2007, the supply of WTI at Cushing was relatively low and near-term prices were high. (Compl. ¶ 23.) Indeed, Wildgoose remarked that the supply was "close to vapors." (Compl. ¶ 23.) On or about January 3, 2008, Dyer predicted that the February supply at Cushing for physical delivery would be approximately seven million barrels of WTI. (Compl. ¶ 27.) Around that time, he and Wildgoose devised a plan to capitalize on the tight market by

accumulating a dominant position in physical WTI. (Compl. ¶ 25.) On January 7, 2008, Wildgoose implored Arcadia's Chief Operating Officer to secure the standard 105% letter of credit so Defendants could commence trading physical WTI: "Can we get this issue resolved pls. time is of the essence here, we need to trade cash with 3rd parties tomorrow as part of the feb/mar wti strategy." (Compl. ¶ 27.)

From January 8 to 18 of 2008, Defendants entered into CMA contracts to purchase 4.6 million barrels of WTI, which amounted to sixty-six percent of the estimated seven million barrel supply. (Compl. ¶¶ 25, 28.) On January 27, Wildgoose revised Dyer's estimate of the February WTI supply downward from seven to five million barrels. (Compl. ¶ 28.) Thus, in fact, Defendants had acquired approximately ninety-two percent of the available WTI supply. (Compl. ¶ 28.) Defendants retained their physical position through January 22, the final day of trading for the near-month NYMEX February WTI futures contracts. Defendants had no commercial need for the physical oil and would likely incur substantial losses by selling it during the cash window. Accordingly, they purportedly lulled the market into believing that they would hold their physical position, keeping near-term supply exceedingly tight. (Compl. ¶¶ 29, 30.)

Concurrently, by January 10, Defendants accumulated 13,600 long February/March calendar spread contracts, equivalent to 13.6 million barrels. (Compl. ¶ 32.) By accumulating such a large percentage of WTI physical contracts, Wildgoose and Dyer inflated the value of their February/March calendar spreads. (Compl. ¶ 32.) In other words, because near term supply was so tight, the price of February futures contracts was pushed higher compared to the price of March contracts, thus increasing the value of Defendants' February/March spread contracts. Specifically, on January 3, 2008, the NYMEX Feb/Mar calendar spreads were trading

at $0.24. By January 18, the February/March spread price had jumped to $0.65. At that point, Defendants dumped 10,700 of their February/March spread contracts for a substantial profit. (Compl. ¶ 32.) By January 22, the spread price was still at $0.64, and Dyer and Wildgoose sold Defendants' remaining contracts. (Compl. ¶ 32.)

On January 23, 2008, the first day of the January cash window, the February futures contracts expired, and March became the new near month. (Compl. ¶ 34.) Defendants still held nearly all of their 4.6 million-barrel physical WTI position for delivery in February. (Compl. ¶ 34.) Because near-term supply remained tight, the March/April 2008 calendar spread contracts traded at a high price. (Compl. ¶¶ 34, 35.) For example, on January 23, the March/April spread was $0.37 and, the price increased to $0.42 on January 24. (Compl. ¶ 35.) Knowing they would soon surprise the market by selling their physical contracts, Defendants accumulated 12.2 million barrels worth of short March/April spread contracts between January 22 and 25. (Compl. ¶ 35.)

On January 25, the last day of the cash window, Defendants dumped all 4.6 million barrels of their physical contracts on the market at a considerable loss. (Compl. ¶ 37.) Immediately, the market lurched from backwardation to contango, and the March/April spread price crashed from $0.42 to $0.24. (Compl. ¶¶ 38, 39.) At that point, Defendants cashed in their short position and the scheme was complete. (Compl. ¶ 40.)

Credit issues prevented Defendants from replicating their scheme in February. (Compl. ¶ 41.) But they successfully executed it again in March 2008. (Compl. ¶¶ 42-48.) While Defendants lost fifteen million dollars by holding their physical contracts through the last day of the cash windows, their trading in calendar spread contracts in January and March 2008

netted them more than fifty million dollars in profit. (Compl. ¶ 52.)  In the five years between January 2006 and January 2011, the WTI market switched from backwardation to contango only twice—in January and March of 2008—precisely when Defendants executed their scheme. (Compl. ¶ 38.)

In April 2008, Wildgoose and Dyer attempted to repeat their scheme yet again and acquired eight million barrels of physical WTI for May delivery.  They also established a sixteen million barrel long May/June calendar spread position.  (Compl. ¶ 50.)  On or about April 17, 2008, Defendants received a subpoena from the Commission and learned they were under investigation.  (Compl. ¶ 51.)  Defendants then abandoned their plan and did not sell their entire physical position on the last day of the April cash window.  (Compl. ¶ 51.)  Following a three-year investigation, the Commission brought this action alleging manipulation and attempted manipulation of WTI commodities in violation of sections 6(c), 6(d) and 9(a)(2) of the CEA, 7 U.S.C §§ 6(c), 6(d), and 13(a)(2).

## DISCUSSION

### I.  Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  To determine plausibility, courts follow a "two pronged-approach."  Iqbal, 556 U.S. at 679.  "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Harris v. Mills, 572 F.3d 66,

72 (2d Cir. 2009) (internal punctuation omitted).  Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129 S. Ct. at 1950).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citation omitted).  Nevertheless, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. Fact-specific questions cannot be resolved on the pleadings.  A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."  Anderson News, L.L.C. v. Am. Media, Inc., --- F.3d ----, 2012 WL 1085948, at *19 (2d Cir. 2012) (internal quotations omitted).

"Rather, in determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true.'"  Anderson News, 2012 WL 1085948, at *19 (quoting Twombly, 550 U.S. at 555). Even if the allegations seem doubtful, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations."  Twombly, 550 U.S. at 556 (internal quotation marks omitted).  Because the plausibility requirement "does not impose a probability requirement at the pleading stage, . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."  Twombly, 550 U.S. at 556 (internal quotation marks omitted).

II. <u>Standing</u>

A. <u>Calendar Spread Trades</u>

The Commission may only bring claims alleging violations of the CEA.  <u>See</u> 7

U.S.C. § 13a-1(a); <u>see also</u> <u>Dunn v. CFTC</u>, 519 U.S. 465, 470 (1997) (dismissing the

Commission's action based on transactions in foreign currency that fell within a statutory

exemption to the CEA).  Sections 6(c), 6(d), and 9(a)(2) of the CEA make it unlawful to

manipulate or attempt to manipulate the "market price of any commodity," whether in interstate

commerce or in a futures contract.  Section 1a(4) defines "commodity" to include (a) goods and

articles as well as (b) services, rights, and interests that are the subject of a futures contract.  7

U.S.C. § 1a(4).

Defendants argue that calendar spreads are exempt from regulation by the

Commission.  They contend that a calendar spread is not a commodity because it is neither a

good or article, nor is it a service, right, or interest that is the subject of a futures contract.

Rather, they maintain that a spread is the differential between the prices of two commodities or

the prices of the same commodity in different time periods, and not the actual price of either of

those contracts.  In support of their position, Defendants cite cases in which courts have rebuffed

the Commission's attempt to police transactions that fall outside of the definition of a

commodity.  For example, in <u>Dunn</u>, the Supreme Court rejected Commission's attempt to exert

jurisdiction over trading accounts in foreign currency options.  <u>See</u> 519 U.S. at 470.

But the problem with Defendants' argument is that a spread is comprised of two

constituent commodities contracts.  "A spread shall consist of the simultaneous purchase of one

future month and sale of another future month at a stated price difference."  <u>See</u> NYMEX Rule

200.11; see also Shashaani v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1986 WL 66151, at

*3 (CFTC Sept. 22, 1986) ("[W]hen evidence establishes that the intention of the trader in

establishing individual positions was to profit from, and undertake the risk of, a change in the

relationship between the value of the contracts, the individual contracts [in a spread] are

constituent parts of a single transaction."). An increase or decrease in the price of one of the legs

relative to the other impacts the overall price of the spread.

   Thus, courts and the Commission have long recognized that the CEA applies to

calendar spreads. See, e.g., Great Western Food Distribs. V. Brannan, 201 F.2d 456, 482-484

(7th Cir. 1953) (finding the intentional manipulation of the spread price of egg futures contracts

in violation of the CEA); In re Amaranth Natural Gas Commodities Litig., 612 F. Supp. 2d 376,

388 (S.D.N.Y. 2009) (denying motion to dismiss complaint alleging manipulation of spread

prices); In re Paul K. Kelly, No. 08-01, 2007 WL 3130589, at *4 (CFTC Oct. 25, 2007) (finding

respondent engaged in conduct "with the intent to affect the price spread between the November

and December Unleaded Gasoline Futures Contracts"); In re Wayne I. Elliott, et al., No. 95-1,

1998 WL 39409, at *3, *12 (CFTC Feb. 3, 1998) (scrutinizing wheat futures spread trades).

   If Defendants' narrow reading of the CEA were correct, traders would be free to

manipulate spread prices without regulatory oversight. But section 2(a)(1)(A) of the CEA

provides that the Commission "shall have exclusive jurisdiction . . . with respect to . . .

transactions involving contracts of sale of a commodity for future delivery . . . traded or executed

on a contract market…subject to regulation by the Commission." 7 U.S.C. § 2(a)(1)(A). A

spread transaction is plainly a "transaction" involving contracts of sale of a commodity for future

delivery. See 7 U.S.C. § 6a(a) (2006) (defining spreads as "transactions" and authorizing the

CFTC to impose or exempt such transactions from position limits);  see also Dunn, 519 U.S. at

470 (interpreting the terms "transaction" and "involve" broadly in the context of the Treasury

Amendment to the CEA).  Accordingly, this Court declines to be the first to hold that calendar

spreads fall outside the anti-manipulation provisions of the CEA.

B.  Exemption under Section 2(g) of the Act

Defendants next argue that the CMA physical contracts establishing their long

position in WTI are excluded under section 2(g) of the CEA, and that this suit falls outside of the

Commission's regulatory authority.  Section 2(g) provides:

> No provision of this Act (other than section 5a (to the extent provided in
> section 5a(g)), 5b, 5d or 12(e)(2)) shall apply to or govern any agreement,
> contract, or transaction in a commodity other than an agricultural
> commodity if the agreement, contract, or transaction is –
>
> (1) entered into only between persons that are eligible contract
> participants at the time they enter into the agreement, contract, or
> transaction;
>
> (2) subject to individual negotiation by the parties; and
>
> (3) not executed or traded on a trading facility.

7 U.S.C. § 2(g).  Defendants contend that the CMA contracts were entered into by eligible

participants, that the contracts were individually negotiated, and that they were not executed on a

trading facility.

Defendants' arguments fail for two reasons.  First, the Commission alleges that

the CMA contracts are standardized, and that all material terms, except for price and volume, are

not subject to individual negotiation, and that they were executed on a trading facility.  (Compl. ¶

19.)  These allegations are fact sensitive and cannot be resolved on a motion to dismiss.  See

Anderson News, 2012 WL 1085948, at *19 ("[I]n determining whether a complaint states a

claim that is plausible, the court is required to proceed on the assumption that all the [factual]

-12-

allegations in the complaint are true.") (internal quotations omitted). In addition, the

Commission alleges that the CMA contracts at issue are indistinguishable from CMA contracts

traded on electronic trading facilities. (Compl. ¶ 19.) Because a trading facility does not

provide the opportunity for traders to negotiate the terms of transactions the CMAs at issue here

are not subject to individual negotiation. See CFTC v. Co Petro, 680 F.2d 573, 580 (9th Cir.

1982) (finding that futures contracts traded on designated markets were standardized except with

respect to price).

A negotiable price does not alone mean that a contract is "subject to individual

negotiation" under section 2(g). See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456

U.S. 353, 358 (1982) (explaining that the only variable in a standardized futures contract is the

price). Nevertheless, Defendants maintain that even if the material terms of CMAs are

standardized, a court may still consider the CMAs subject to negotiation:

> [A] contract can be subject to negotiation, even if some of the terms are
> predetermined.... Most contracts for delivery of a commodity will have
> some of the terms predetermined. Once a party has decided which
> commodity it would like to purchase, the quality specifications for that
> particular quantity as well as the place for delivery will often already be
> set. The fact that those terms are the same in any contract for a given
> commodity cannot make a contract ineligible for the protection of section
> 2(g). If it did, the exception would be so narrow that it would not bring
> the desired certainty to the market.

United States v. Radley, 659 F. Supp. 2d 803, 811 (S.D. Tex. 2009).

But Radley is readily distinguishable because the parties to the propane contracts

at issue in that case individually negotiated the financial, credit, and legal terms of the contracts.

Radley, 659 F. Supp. 2d at 811. Here, unlike in Radley, there is no allegation that the parties

individually negotiated financial, credit, and legal terms. Instead, the Commission avers that

prior to engaging in any CMA transactions, physical market participants qualify for such

transactions by meeting certain financial and credit-related requirements.  After parties

consummate a CMA transaction, they post a standardized stand-by letter of credit from a third-

party bank for 105% of the contract's value.  The amount and timing of the letter of credit are not

subject to individual negotiation.  (Compl. ¶ 19.)  These blanket terms are reached as a one-time

prerequisite to trading, and are not negotiated for each individual transaction.  This degree of

uniformity was absent in the Radley contracts.

  The Commission also alleges that Defendants, acting through third parties,

executed CMA contracts on HoustonStreet, an electronic trading facility.  While Defendants

counter that the Commission fabricated this allegation and attach a sampling of CMA contracts

to their opposition, this factual dispute cannot be resolved at the pleading stage.  See Anderson

News, 2012 WL 1085948, at *19

  Defendants' argument also fails because even if the CMA contracts were exempt

under section 2(g), the Complaint alleges manipulation of the calendar spread contracts.  And

there is no contention that calendar spreads or futures contracts are exempt under section 2(g).

Thus, even if section 2(g) immunizes the manipulation of the physical transactions in question,

the CFTC has the authority to prevent Defendants' manipulation of the spread prices of futures

contracts.

  Defendants' interpretation excludes from the CEA any course of conduct that

happens to involve transactions covered by section 2(g).  But such a broad reading frustrates the

CEA's primary purpose of preventing and deterring price manipulations.  And it is this Court's

duty "to give harmonious operation and effect to all statutory provisions if possible, absent some

explicit indication of legislative intent derived from either the words of the statute or its

legislative history." <u>Yiu Sing Chun v. Sava</u>, 708 F.2d 869, 874 (2d Cir. 1983).  Section 2(g) is a limited exception to a remedial statute that exempts only specified transactions from regulation; as such, it "should be narrowed and limited to effect the remedy intended." <u>Piedmont & N. Ry. Co. v. Interstate Commerce Comm'n</u>, 286 U.S. 299, 311-12 (1932).  Accordingly, because section 2(g) does not cover calendar spread contracts, Defendants' motion to dismiss on that ground is denied.

III. <u>Market Manipulation</u>

  To state a claim for manipulation, the CFTC must plead that (1) the defendant possessed the ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant intended to do so.  <u>See</u> <u>In re Cox, et anon.</u>, No. 75-16, 1987 WL 106879, at *4 (CFTC July 15, 1987); <u>see also</u> <u>In re Amaranth Natural Gas Commodities Litig.</u>, 587 F. Supp. 2d 513, 531 (S.D.N.Y. 2008).

 A. <u>Applicable Legal Standard</u>

  Defendants argue that all manipulation claims necessarily sound in fraud and must therefore satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  But the weight of authority rejects this bright line rule in favor of a case-by-case examination into whether the allegations do, in fact, "sound in fraud." <u>In re Crude Oil Commodity Litig.</u>, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007).

  Most courts in this district apply this case-by-case approach to determine whether Rule 9(b) applies to claims of manipulation under the CEA.  "The CEA has a separate anti-fraud section apart from the anti-manipulation provision[.]  When the statute distinguishes fraud and manipulation by addressing them in different provisions, it would be redundant to construe manipulation to require a fraud element." <u>CFTC v. Amaranth Advisors LLC</u>, 554 F. Supp. 2d

-15-

523, 534 (S.D.N.Y. 2008) (citation omitted) (applying Rule 8(a) where allegations of attempted

manipulation were not based on misleading statements or omissions, but on a particular trading

strategy); see also In re Crude Oil Commodity Litig., 2007 WL 1946553, at *4-5 (finding that

Rule 9(b) applied to claims that defendants made false and misleading statements to support their

manipulation scheme); In re Natural Gas Commodity Litig., 358 F. Supp. 2d 336, 343 (S.D.N.Y.

2005) (applying Rule 9(b) where allegations involved the dissemination of misleading

information and false reporting).  While some courts have held that all market manipulation

claims trigger Rule 9(b), see In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d at

535 (citing ATSI 5 Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 101 (2d Cir. 2007)

(interpreting Securities Exchange Act of 1934)), the majority follows the more nuanced

approach.

      Adopting this case-by-case approach, this Court finds that the alleged scheme is

based on the abuse of market power, rather than fraud, and Rule 9(b)'s heightened pleading

standard therefore does not apply.  The Commission describes a scheme where Defendants

acquired a dominant position in the physical WTI market, held that position through the futures

expiry and the commencement of the cash window, and intended to apply upward pressure on

WTI spread prices. (Compl. ¶¶ 25, 27-29, 42, 43, 50.)  The Commission does not allege that

Defendants acquired and held their dominant position in a deceitful or misleading manner.

Rather, Defendants intended that WTI spread prices would be driven upward, thus increasing the

value of their long WTI derivatives position.  (Compl. ¶¶ 25, 32, 33, 44, 45.)  Similarly, the

Commission does not allege that Defendants sold their position in the cash window in a

fraudulent manner.  Instead, the Commission's theory is that Defendants intended the market to

take notice of and react to the large quantity of physical WTI they held until the last day of the cash window. (Compl. ¶¶ 36–40, 46, 47.) The Commission alleges that after Defendants flooded the WTI market, the price of WTI calendar spread prices dropped precipitously, thereby increasing the value of Defendants' short position. (Compl. ¶¶ 34, 35, 47.) Cf. In re Crude Oil Commodity Litig., 2007 WL 1946553, at *4-5 (finding manipulation sounded in fraud where alleged conduct included making false and misleading statements to investors and regulators). This scheme was not the product of misstatements or material omissions; it was based on Defendants' abuse of a dominant market position. Accordingly, Rule 8, and not Rule 9, governs the Complaint.

### B. Ability to Influence Prices

Because the Commission alleges that Defendants manipulated the market through a dominant position, it must plead facts showing that Defendants held a controlling long position in the market in order to demonstrate the requisite ability to direct the market price. See Frey v. CFTC, 931 F.2d 1171, 1175 (7th Cir. 1991). Market dominance depends on the deliverable supply of a commodity. See Apex Oil Co. v. DiMauro, 713 F. Supp. 587, 602 (S.D.N.Y. 1989); see also In re Cox, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,767, at 27,075 (CFTC Jan. 3, 1983). The deliverable supply of a commodity is supply that is readily available for delivery at a specified time, either because it is stored locally or because it is located within a deliverable distance from the market. See Cargill Inc. v. Hardin, 452 F.2d 1154, 1165 (8th Cir. 1971).

But the ability to influence prices can manifest itself in various ways, including the exercise of market power, Cargill, 452 F.2d at 1164-65, or the exacerbation of a congested

-17-

market, <u>Abrams</u>, 1995 WL 455796, at *6.  Whether Defendants exercised market power is fact-intense, and courts reserve dismissal on this issue for pleadings containing only bare and conclusory allegations.  <u>See, e.g.</u>, <u>Crosswood Magazine Inc. v. Times Books</u>, No. 96 Civ. 4550 (SJ), 1997 WL 227998, at *2 (E.D.N.Y. May 5, 1997) ("Plaintiffs . . . have pleaded no facts indicating that [defendant] has the power to fix prices or exclude competition in the alleged relevant market."); <u>Telectronics Proprietary, Ltd. v. Medtronic, Inc.</u>, 687 F. Supp. 832, 838 (S.D.N.Y. 1988) (dismissing complaint which baldly averred that defendants had "monopolized and continue to monopolize the relevant markets") (internal quotations omitted).

　　　　Here, the Commission sufficiently pleads Defendants' ability to affect prices. The Commission alleges that, during the relevant period, supplies of WTI at Cushing were tight, and the market was in backwardation.  (Compl. ¶¶ 23, 27.)  The Commission further alleges that Defendants exacerbated that condition by accumulating and holding a dominant position in the physical WTI market, with a position of 4.6 million barrels in January and 6.3 million barrels in March.  (Compl. ¶¶ 28, 43.)  Most importantly, the Commission alleges that Defendants' sell-off caused the relevant cash/futures prices to flip from backwardation to contango.  (Compl. ¶¶ 38, 48.)

　　　　Despite these allegations, Defendants argue that the Commission fails to allege a dominant position because it does not plead the actual supply and demand amounts of WTI available at Cushing, does not allege that Defendants knew those amounts, and does not allege that Defendants' estimates of the supply were accurate.  But Defendants demand far more information than is required by Rule 8.  The allegation that Defendants' sell-off caused or at least contributed to the market moving from backwardation to contango is sufficient.  By analogy to

antitrust law, where an element of proof involves the ability to affect prices, a complaint is sufficient if it alleges "direct measurements of a defendant's ability to control prices[.]" Pepsi Inc. v. Coca-Cola, 315 F.3d 101, 108 (2d Cir. 2002). Defendants' ability to change the market from backwardation to contango is similarly a "direct measure" of control and demonstrates ability to influence the market.

Defendants next argue that to hold a dominant position that can influence market prices of futures contracts, the manipulator must have a dominant position in both the cash and futures markets. See, e.g., Apex Oil, 713 F. Supp. at 601-02. However, Defendants mischaracterize the Complaint as alleging a "squeeze" of the futures market. The Complaint does not allege that Defendants sought to affect the spread prices by dominating the long futures market. Rather, the Commission alleges that Defendants established their long futures positions to profit from the artificial spread prices in crude oil futures caused by their conduct in the physical market. Thus, cases requiring a dominant position in both the cash and futures market to plead a squeeze are inapposite. Cf. Apex Oil, 713 F. Supp. at 602 (requiring dominance in both the cash and futures markets in an alleged squeeze of the futures market).

Finally, Defendants claim they could not have had a dominant position in the market because they sold their physical contracts at a loss during the cash window. But this argument similarly misconstrues the theory undergirding the Complaint. The Commission alleges that Defendants intentionally dumped their long physical position in a concentrated period of time, putting downward pressure on the near-term price of WTI. (Compl. ¶¶ 30, 36-40, 46-48.) Further, the Commission alleges that Defendants established a short position in the futures market in anticipation of the price decrease. (Compl. ¶¶ 3, 25, 34, 35, 45.) The

-19-

Commission does not allege that Defendants cornered the market and could dictate the commodity price when covering their shorts. Accordingly, the allegations regarding the sell-offs at lower prices do not "undercut the theory that [Defendants] had the ability to influence" prices. (Defs. Br. at 21-22.) In any event, this Court must draw all inferences in the Commission's favor on a motion to dismiss.

### C. Artificial Price

To plead manipulation, a plaintiff must allege the existence of an artificial price in the commodity at issue. An artificial price is a price that "does not reflect basic forces of supply and demand." In re Soybean Futures Litig., 892 F. Supp. 1025, 1044 (N.D. Ill. 1995); see also Cargill, 452 F.2d at 1163 ("The aim must be . . . to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect the basic forces of supply and demand."). "[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone." In re Kosuga, 19 Agric. Dec. 603, 618 n.4 (U.S.D.A. 1960) (quoting United States v. Socony Vacuum Oil Co., 310 U.S. 150, 223 (1940)) (internal quotation marks omitted).

The Commission alleges that the prices of WTI calendar spread contracts were artificial on the last four days of trading in February and April 2008 futures contracts as well the first two days of the January and March cash windows. Further, the Commission alleges that these prices did not reflect the legitimate forces of supply and demand because they resulted, at least in part, from Defendants' price-distorting conduct. (Compl. ¶¶ 25, 27-30, 42, 43, 45.)

Defendants attach to their motion the daily prices for the relevant calendar spread and futures contracts from January 1 through April 2008. (See Declaration of Timothy J. Carey, dated September 29, 2011, Ex. A: January through April 2008, Daily NYMEX Crude Oil Futures and Inter-Month Spread Prices ("Daily NYMEX Price Sheets")). "[T]he district court may take judicial notice of well publicized stock prices without converting the motion to dismiss into a motion for summary judgment." Ganino v. Citizens Utils. Co., 228 F.3d 154, 166 n.8 (2nd Cir. 2000). Based on that data, Defendants argue that the Commission's theory of manipulation and artificial price is entirely implausible. Specifically, Defendants observe that, with few exceptions, the calendar spread prices were higher on days preceding those on which the Commission claims the prices were artificial. According to Defendants, a price cannot be artificially high if it is lower than the non-artificial price immediately preceding it.

But a price may be artificial if it is higher than it would have been absent Defendants' conduct. See In re Cox, 1987 WL 106879, at *9 (recognizing that "the prospective behavior of a 'normal' market is not necessarily bounded by the market's historical experiences"). To determine an artificial price one must look to "the broadest possible range of relevant cash market transactions" and proof of artificiality is not found solely in comparing one day's price to another. In re Cox, 1987 WL 106879, at *10 ("Of course, such prices have general relevance to the inquiry. At the same time, they are not dispositive in and of themselves."). Rather, determining artificiality involves an analysis of the suspected price in context of the aggregate supply and demand factors. See Great Western, 201 F.2d at 482; see also In re Ind. Farm Bureau Coop. Ass'n, et anon., No. 75-14, 1982 WL 30249, at 35 n.2 (CFTC Dec. 17, 1982) (Chairman Johnson, concurring).

-21-

Despite the prices reflected in the Daily NYMEX Price Sheets, the Complaint describes a rare phenomenon that occurred as a consequence of Defendants' alleged conduct: the market's abrupt shift from backwardation to contango. (Compl. ¶¶ 38, 48.) Before Defendants dumped their physical position, the market was in a state of backwardation, evidencing a premium for nearby crude relative to the next month out. When Defendants sold their physical position on the last day of the cash window, the market heaved from backwardation to contango. That dislocation evidenced the market's surprise at a sudden and unanticipated flood of near-term supply. In an instant, expensive near term crude became less valuable than crude deliverable in later months and long spread contracts lost nearly half of their value. These allegations make it at least plausible that the calendar spread prices did not reflect the basic forces of supply and demand.[2]  Anderson News, 2012 WL 1085948, at *19 (the district court may not select among plausible explanations). And at this preliminary stage, this Court assumes the allegations are true, and does not consider whether they are probable in light of the pricing data contained within the Daily NYMEX Price Sheets.

D. Causation

Many of the allegations addressing Defendants' ability to affect prices also relate to causation. See In re Soybean Futures Litig., 892 F. Supp. at 1045 (noting that the traditional

---

[2]  This Court declines to follow Radley to the extent that it found the CEA unconstitutionally vague on this issue. See Radley,  659 F. Supp. 2d at 815-16 (finding that, absent accusations of false and misleading statements, defendants' lawful transactions were necessarily part of the legitimate forces of supply and demand and therefore could not contribute to an artificial price). Radley contradicts the established principle that the CEA reaches such well-recognized manipulations as intentional squeezes. See Cargill, 452 F.2d at 1161-63 ("We think the test of manipulation must largely be a practical one if the purposes of the Commodity Exchange Act are to be accomplished. The methods and techniques of manipulation are limited only by the ingenuity of man.") Thus, Radley is a bridge too far.

four elements of proof in a manipulation case are "occasionally modified to fit the specific facts of a particular case, and there is some question to what extent these elements should be treated as separate and independent or whether they are factually and legally interdependent."). Specifically, the Commission alleges that Defendants' sell-off caused the cash/nearby futures relationship to switch from backwardation to contango in a short period of time. (Compl. ¶¶ 38, 48.) Such volatility demonstrates that the market reacted sharply to the new information that additional barrels were available. In short, but for Defendants' withholding of its physical position, the market would have taken account of the deliverable supply, and the spread price would not have been artificially elevated.

In addition, the Commission alleges that Wildgoose and Dyer—experienced crude oil traders—believed that they affected the WTI spread prices. On January 28, 2008, Wildgoose observed that their trading affected the price spreads and that it had "the desired effect" on the March/April spread. (Compl. ¶ 40.) On March 25, 2008, Wildgoose again observed with respect to their strategy that the "spreads came off with may/june but not as much as hoped." (Compl. ¶ 46.)

Defendants assert that the Commission fails to allege that Defendants' conduct was the proximate cause of the artificial prices and that the Commission fails to describe the means by which Defendants widened the spread prices. But, "[i]t is enough, for purposes of a finding of manipulation in violation of sections 6(b) and 9[(a)(2)] of the [CEA] that respondents' action contributed to the price [movement]." In re Kosuga, 19 Agric. Dec. at 624; see also In re Cox, 1987 WL 106879, at *12 (holding that a charge of manipulation can be sustained where respondents' acts are a proximate cause of the artificial price). Moreover, the Commission

-23-

alleges that Defendants refrained from selling their long physical position in a tight market, leading other market participants to conclude that the supplies associated with such a position were committed to commercial use and therefore unavailable. (Compl. ¶ 25.) That conduct, the Commission alleges, sent pricing signals to the futures market, causing the front month of the relevant calendar spreads to increase in value relative to the next month. (Compl. ¶ 25.) These non-conclusory allegations are sufficient to withstand a motion to dismiss.

Finally, Defendants contend that the allegations of causation are implausible because the physical and futures market converged during the relevant periods. As a result, Defendants claim that the upward price effect of holding a 4.6 million-barrel physical position would have been neutralized by selling a 13.6 million-barrel long futures spread position. Whether Defendants' physical position was neutralized is a question of fact that cannot be resolved on a motion to dismiss. See Anderson News, 2012 WL 1085948, at *19.

E.  Scienter

Defendants argue that the Commission fails to plead the required intent to manipulate. To meet the specific intent element of a claim for manipulation or attempted manipulation of a futures contract, the Commission must plead that Defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." In re Energy Transfer Partners Natural Gas Litig., No. 4:07-cv-3349 (KPE), 2009 WL 2633781, at *5 (S.D. Tex. Aug. 26, 2009). Defendants argue that the allegations in the Complaint merely express an expectation of profits and inevitable market movement, which do not constitute intent to manipulate. See Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239, 248 (5th Cir. 2010); In re Crude Oil

Commodity Litig., 2007 WL 1946553, at *8 ("Such a generalized motive, one which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent.").

However, even under the more stringent pleading requirements of Rule 9(b), which do not apply here, plaintiffs are not expected to plead a defendant's state of mind specifically. See Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); see also In re Crude Oil Commodity Litig., 2007 WL 1946553, at *8. Because "proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." Ind. Farm Bureau, 1982 WL 30249, at *6; see also In re Hohenberg Bros. et anon., No. 75-4, 1977 WL 13562, at *7 (CFTC Feb. 18, 1977) ("Intent is a subjective factor and since it is impossible to discover an attempted manipulator's state of mind, intent must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances.").

In the context of a squeeze, manipulative intent may be inferred "where, once the congested situation becomes known . . . the [defendant] exacerbates the situation by, for example, intentionally decreasing the cash supply or increasing his long in the futures market." Ind. Farm Bureau, 1982 WL 30249, at *10 n.12; see also In re Abrams et al., No. 88-10, 1995 WL 455791, at *6 (CFTC July 31, 1995) ("[E]ven if a dominant long played no role in the creation of a congested market, he has a duty to avoid conduct that exacerbates the situation."). By analogy, the Commission alleges that Wildgoose and Dyer were aware of a tight physical market at Cushing, (Compl. ¶¶ 23, 27), yet they continued to build their physical position and

their long futures position leading up to the expiry of the futures contract. (Compl. ¶¶ 28, 29, 37, 43, 46.)  The Commission contends that this accumulation and holding of the physical WTI position exacerbated an already tight Cushing market. (Compl. ¶¶ 3, 42.)  Although the Commission does not allege a squeeze or a congested market,[3] the reasoning in such decisions applies equally here.  The Commission alleges that Defendants did not simply "seek the best price from an existing situation," but exacerbated the tightness in the physical supply.  Ind. Farm Bureau, 1982 WL 30249, at *10.  Thus, manipulative intent can be inferred from Defendants' trading activity following their awareness of the tight market.

In addition, Defendants' intent to manipulate the futures price spreads can be inferred from their alleged conduct and contemporaneous communications.  First, the Complaint sets forth multiple communications between Wildgoose and Dyer as they planned and executed their strategy.  (Compl. ¶¶ 24, 27, 28, 31, 36, 40, 43, 46.)  These statements can be construed as more than mere statements of expectation or general profit motive.  They were, for example, forecasts of Arcadia's activity, and included Wildgoose's observation that their activity had, at least in part, "the desired effect." (Compl. ¶ 40.)  Second, the Complaint sets forth Defendants' efforts to acquire a dominant position in an already tight market, and to surprise the market. (Compl. ¶¶ 25, 28-30, 32-38, 42-44, 48, 50.)  Third, Defendants took financial positions based on the anticipated effect of their building, holding, and dumping their physical position.  (Compl. ¶¶ 25, 26, 31, 32, 33, 34, 35, 39.)  These allegations suffice to plead Defendants' manipulative intent.

---

[3] A congested market exists only when deliverable supply is insufficient to meet the delivery obligations of the futures contract.  In re Cox, 1987 WL 106879, at *8 ("market congestion cannot exist when deliverable supplies are adequate").

IV.  Attempted Manipulation

Defendants contend that the Complaint fails to state a claim for attempted manipulation.  To prove an attempted manipulation claim, the CFTC must establish: (1) an intent to affect the market price of a commodity; and (2) some overt act in furtherance of that intent. See Hohenberg Bros., 1977 WL 13562, at *7.  The intent requirement is the same for both manipulation and attempted manipulation claims. See Hohenberg Bros., 1977 WL 13562, at *7; Ind. Farm Bureau, 1982 WL 30249, at *5.

The Commission alleges attempted manipulation in the alternative for all of Defendants' conduct in January and March 2008.  (Compl. ¶¶ 49-51, 58-62.)  The facts alleged regarding their intent and overt acts in these months are set forth in the earlier discussion regarding manipulation.  In addition, the Commission alleges that Defendants attempted to manipulate the May/June 2008 NYMEX WTI calendar spread during the month of April 2008. (Compl. ¶¶ 49-51, 58-62.)  In support of those allegations, the Commission avers that, in April 2008, Defendants began to repeat the pattern of conduct they had executed in January and March—they built a substantial cash position and a substantial long calendar spread position in the futures market. (Compl. ¶ 50.)  Consequently, the factual allegations establishing intent in relation to Defendants' conduct in prior months apply equally to their conduct in April.  See, e.g., United States v. Tann, 532 F.3d 868, 873 (D.C. Cir. 2008) (finding jury could infer intent from a pattern of behavior consisting of two prior similar incidents).

Finally, the Commission alleges that Wildgoose and Dyer engaged in an overt act in April 2008.  Specifically, as they had in January and March, Dyer and Wildgoose once again built a substantial physical position, accumulating nearly 8 million barrels. (Compl. ¶ 50.)  They

also established a long May/June 2008 WTI calendar spread position of nearly sixteen million

barrels, from which they intended to profit as a result of their physical trading, as they had in

January and March. (Compl. ¶ 50.) Therefore, the Commission plausibly alleges that Defendants

attempted to manipulate the price of the May/June 2008 NYMEX WTI calendar spread in April

2008.  Accordingly, Defendants' motion to dismiss this claim is denied.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is denied.  The Clerk of

the Court is directed to terminate the motion pending at ECF No. 40.

Dated: April 26, 2012
     New York, New York           SO ORDERED:


                               WILLIAM H. PAULEY III
                                  U.S.D.J.

*Counsel of Record:*

Gregory Scopino, Esq.
Christine M. Ryall, Esq.
Paul G. Hayeck, Esq.
Joan Manley, Esq.
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, DC 20581
*Counsel for Plaintiff*

Timothy J. Carey, Esq.
Elizabeth M. Bradshaw, Esq.
Brigitte T. Kocheny, Esq.
Dewey & LeBoeuf LLP
180 North Stetson, Suite 3700
Chicago, IL 60601-6710

William G. Primps, Esq.
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019

Fred F. Fielding, Esq.
Mark R. Haskell, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Defendants*